UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
─────────────────────────────────

ERIC FULLER,

                              Petitioner,

            v.                                    9:09-CV-1025
                                                  (TJM)

HAROLD GRAHAM,
                              Respondent.


─────────────────────────────────

APPEARANCES                          OF COUNSEL

KINDLON, SHANKS LAW FIRM             TERENCE L. KINDLON, ESQ.
Attorneys for Petitioner
74 Chapel Street
Albany, NY 12207

HON. ERIC T. SCHNEIDERMAN            THOMAS B. LITSKY, ESQ.
New York State Attorney General      Ass't Attorney General
Attorney for Respondent
120 Broadway
New York, NY 10271

THOMAS J. MCAVOY
Senior United States District Judge


                    **DECISION AND ORDER**

**I.    INTRODUCTION**

        Petitioner Eric Fuller has filed an amended petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  Dkt. No. 48, Amended Petition ("Am. Pet.").  He is

represented by attorney Terence L. Kindlon, and is currently in the custody of the New York

Department of Corrections and Community Supervision at Auburn Correctional Facility.

Petitioner raises two substantive grounds for habeas relief:  (1) trial counsel was ineffective

for failing to consult with or call a DNA expert at trial and for failing to properly cross-examine

the People's DNA expert; and (2) the trial judge should have recused himself because he previously presided over petitioner's family court custody proceeding. Am. Pet. at 6-8; Dkt. No. 53, Respondent's Memorandum of Law ("R. Mem.") at 23. Petitioner's counsel has filed several exhibits and a memorandum of law in support of the amended petition. Dkt. No. 48-1 through 48-5, Exhibits; Dkt. No. 48-6, Petitioner's Memorandum of Law ("P. Mem."). Respondent has filed an answer to the amended petition, a memorandum of law, and state court records. Dkt. No. 52, Answer; Dkt. No. 53, R. Mem.[1]

For the reasons that follow, after carefully considering all of the parties' arguments and submissions, the amended petition is denied and dismissed.

## II.    RELEVANT BACKGROUND

Petitioner challenges a May 8, 2003 judgment of conviction in Essex County Court, following a jury trial, of first degree rape (N.Y. Penal Law § 130.35(2)), third degree rape (N.Y. PENAL LAW § 130.25(2)), first degree sexual abuse (N.Y. PENAL LAW §130.65(1)) (two counts), first degree sexual abuse (N.Y. PENAL LAW §130.65(2)) (two counts), forcible touching (N.Y. PENAL LAW § 130.52(2)), unlawful dealing with a child (N.Y. PENAL LAW § 260.20(2)) (three counts), and endangering the welfare of a child (N.Y. PENAL LAW § 260.10(1) (four counts). Am. Pet. at 2; P. Mem. at 2 & n.1. Petitioner timely appealed to the Appellate Division, Third Department, arguing that: the evidence was insufficient to support his convictions for first degree rape, third degree rape, forcible touching, and both counts of

_____

[1] Most of the state court records were filed by respondent on February 8, 2010. They were filed under seal pursuant to section 50-b of the New York Civil Rights Law. The remaining records relevant to petitioner's claims were filed by petitioner's counsel as exhibits to the amended petition. Dkt. No. 48-2 through 48-5. The transcript of the hearing held on petitioner's state court motion to vacate his conviction was filed by respondent on January 31, 2013. Dkt. No. 56.

first degree sexual abuse; the trial court improperly admitted evidence of petitioner's uncharged crimes or bad acts; the sentence imposed was excessive; and the trial judge abused his discretion when he denied petitioner's motion for recusal. Exhibit A, Appellant's Brief at 1-62. Petitioner also argued that trial counsel was ineffective for failing to call a DNA expert; place a theory or defense before the jury; call an expert on physical intoxication; cross-examine witnesses effectively or object at various points during trial; determine how much alcohol the victims drank; subpoena records from the People's DNA expert; and give an appropriate opening statement and an adequate summation. *Id.* at 40-56. The People opposed the appeal, and petitioner filed a reply brief. Exhibit B, Brief and Appendix of the People of the State of New York ("People's Brief"); Exhibit C, Reply Brief.

On April 3, 2008, the Appellate Division affirmed petitioner's convictions, but reduced one count of first degree sexual abuse to third degree sexual abuse, and remitted that count for re-sentencing. *People v. Fuller*, 50 A.D.3d 1171 (3rd Dep't. 2008). On June 3, 2008, the trial court sentenced petitioner to a determinate term of three months on the remitted charge. R. Mem. at 2. The New York Court of Appeals denied leave to appeal on September 17, 2008. *Fuller,* 11 N.Y.3d 788 (2008).

Petitioner filed his pending habeas petition on or about September 10, 2009. Dkt. No. 1. Respondent answered the original petition on February 8, 2010. Dkt. No. 8, Answer; Dkt. No. 9, Respondent's Original Memorandum of Law. Shortly thereafter, petitioner retained counsel, and an extensive motion practice ensued. Eventually, this action was stayed in order for petitioner to return to state court to litigate a claim that trial counsel was ineffective based upon newly discovered expert testimony. *See* Dkt. No. 31, Order, McAvoy, S.J., Jun. 8, 2011. In accordance with this court's order granting the stay, petitioner filed a motion to

3

vacate his conviction in state court pursuant to New York Criminal Procedure Law ("CPL") §

440.10.  Dkt. No. 48-3, Section 440 Motion.  A hearing was held in the Essex County Court

on the motion on September 29, 2011.  Dkt. No. 56, Hearing Transcript ("H."), Sept. 29,

2011.  The motion was denied on June 8, 2012.  Dkt. No. 48-4, Decision and Order on

Motion Pursuant to CPL § 440.10, Meyer, J. ("Motion Decision").  The Appellate Division

denied leave to appeal on July 31, 2012.  Dkt. No. 48-5, Order denying leave to appeal,

Lahtinen, J.

Petitioner then filed his final amended petition in this court on September 6, 2012.

Dkt. No. 48, Am. Pet.  Respondent filed an answer on January 11, 2013, and the Hearing

Transcript was filed on January 31, 2013.  Dkt. Nos. 52-53, 56.

The Appellate Division, Third Department, briefly summarized the facts of this case:

> During the evening of May 18, 2002, defendant purchased alcohol for his
> teenage daughter and three of her high school girlfriends who had gathered at
> defendant's home in Clinton County. He then left the home, returning at
> approximately 1:00 a.m.  By that time, all of the girls were feeling intoxicated.
> Two girls, victim A (born in January 1986) and victim B (born in September
> 1986),[2] socialized with defendant, who poured shots of liquor which victim A
> and defendant consumed.  As victim B lay on the living room couch, defendant
> allegedly positioned his body on top of her. She pushed him off with her legs
> and stood up, whereupon defendant grabbed her vagina and, as she walked
> away, her buttocks.  Thereafter, defendant was alone in the basement with
> victim A, who laid down on cushions that were situated on the floor and "passed
> out."  When she awoke, defendant had his finger in her vagina and was on top
> of her kissing her face.  According to victim A, she could not say or do anything
> to defendant during the attack because she was not fully conscious; she then
> "passed back out." When she awoke, her pants were around her ankles and
> "stuff" was dripping down her leg.

*Fuller*, 50 A.D.3d at 1172-73; *see* Transcript of Trial of Eric Fuller ("R.") at 422-39, 503-625,

---

[2]  Victim A is referred to by the parties as T.H.  Victim B is referred to by the parties as N.B.

4

633-717, 723-30.[3]  The prosecutor presented forensic evidence with regard to one count of the indictment involving victim A.  She was examined by a registered nurse on May 20, 2002, and vaginal swabs were collected.  R. 551, 769-70, 777, 784.  The next morning, at the nurse's request, victim A returned to the hospital and gave the nurse her pajamas worn the night of the incident.  *Id.* at 552, 779-80.

The swabs and pajamas were turned over to the New York State Police, and the vaginal smear and cuttings from the pajamas tested positive for the presence of sperm.  R. 820, 845, 847, 882, 892.  DNA evidence found on the vaginal swabs was consistent with a mixture of victim A's and petitioner's DNA, with victim A being the major contributor.  *Id.* at 934-38.  The DNA from the sperm sample on victim A's pajama bottoms matched petitioner's DNA profile, and the probability of selecting at random a person with a profile identical to petitioner's with regard to the DNA found on the pajamas was less than 1 in 280 billion.  *Id.* at 940.

At trial, petitioner denied buying alcohol for the victims, and denied any sexual contact with them.  R. 1008-09, 1016-17, 1262, 1265, 1276-92.  He claimed that he shared a "mutual kiss" with victim A, and, "in a moment of excitement, he ejaculated on her hands and pajama bottoms as she attempted to pull down his sweatpants."  *Fuller*, 50 A.D.3d at 1172-73.  He also claimed that although he did not inappropriately touch victim B, he "may have inadvertently made contact with her when he stumbled on a coffee table and placed his hands out to catch himself."  *Id.*; *see* R. 1008-17, 1262, 1265, 1282-92.

---

[3]  The trial transcript has been filed in this court as part of both the Appendix on Appeal and the Record on Appeal.  Both parties refer to the Record on Appeal for the cited pages of the trial transcript.  For the sake of consistency and clarity, the transcript will therefore be referred to as "R."

The remaining, specific facts are known to the parties and will be repeated only to the extent necessary to address petitioner's claims for habeas relief.

## III.    DISCUSSION

### A.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the adjudication of the claim (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398, 1400 (2011) (citing 28 U.S.C. §§2254(d)(1), (2)); *Premo v. Moore*, __ U.S. __, 131 S. Ct. 733, 739 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  The AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, __ U.S. __, 131 S. Ct. 1305, 1307 (2011) (per curiam) (quoting *Renico v. Lett*, __ U.S. __, 130 S. Ct. 1855, 1862 (2010) (internal quotation marks omitted)).  Federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with '"clear and convincing evidence.'" *Schriro*, 550 U.S. at 473-74 (quoting § 2254(e)(1)).  "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Id.* at 473.

## B.     Trial counsel's effectiveness

In Ground One of his petition, petitioner claims that trial counsel was ineffective for not consulting with a DNA expert or calling a DNA expert at trial, and for failing to properly cross-examine the state's DNA expert.  Am. Pet. at 6; P. Mem. at 7-17.  The state courts' rejection of these claims was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

To demonstrate constitutionally ineffective assistance of counsel, a petitioner must show that counsel's performance fell below an objective standard of professional reasonableness, and but for counsel's alleged errors, the results of the proceedings would have been different, and as a result, petitioner suffered prejudice.  *Premo*, 131 S. Ct. at 739; *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  A petitioner must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ... [and] that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  Even if a petitioner can establish that counsel was deficient, he still must show that he suffered prejudice.  *Id.* at 693-94.

Meeting this burden is "never an easy task . . . [and] establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult."  *Premo*, 131 S. Ct. at 739-40 (citations and internal quotation marks omitted).  When reviewing a state court's decision under section 2254, "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable-a substantially higher threshold."  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (internal quotation marks and citation omitted).

Federal habeas courts "must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)" because "[w]hen §2254(d) applies, the question is not whether counsel's actions were reasonable." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 788 (2011). Rather, "the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* Finally, when assessing prejudice, habeas courts "must consider the totality of the evidence before the judge or jury." *Berghuis v. Thompkins*, __ U.S. __, 130 S. Ct. 2250, 2264 (2010) (quoting *Strickland*, 466 U.S. at 695).

The Second Circuit has "underscored the importance of effective representation for defendants in child sexual abuse prosecutions." *Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003); *see Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005); *Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001). In these types of cases, trial counsel is "obliged, wherever possible, to elucidate any inconsistencies in the complainant's testimony, protect the defendant's credibility, and attack vigorously the reliability of any physical evidence of sexual contact between the defendant and the complainant." *Eze*, 321 F.3d at 112.

### 1.    Russell R. Gettig's trial testimony

Russell R. Gettig, Ph.D., a forensic scientist at the New York State Police Laboratory, testified as the state's expert at petitioner's trial. R. 910-53. He explained that he extracted DNA from victim A's and petitioner's blood stain cards that he created from their blood samples, and from the vaginal swab and pajama cuttings. R. 912, 922-29. Using STR[4] DNA analysis, he reviewed thirteen different regions, or loci, to develop DNA profiles for the

---

[4] STR stands for "short tandem repeats." R. 927.

donors of the genetic material found on the vaginal swab.  R. 926-28.  He determined that the vaginal swab sperm fraction contained a mixture of victim A's and petitioner's DNA.  *Id.* at 928-38.  There were no alleles from any other person that "[he] could determine."  R. 938.  The DNA from the sperm fraction on the pajama bottoms matched petitioner's DNA profile, and the probability of selecting at random a person with a profile identical to petitioner's was less than 1 in 280 billion.  *Id.* at 938-41.  The non-sperm fraction on the pajama bottoms matched victim A.  *Id.* at 937.

On cross-examination, Gettig conceded that he could not state that petitioner's DNA matched the male DNA found in the mixture profile developed from the vaginal swab because matches can only be made "against a single source profile."  R. 942-43.  He also acknowledged that the conclusion in his draft report with regard to the vaginal swabs sperm fraction was different from that in his final report.  In the draft report, Gettig concluded:

> The STR DNA mixture profile from the *vaginal swabs- sperm fraction* is consistent with DNA from [victim A] . . . admixed with DNA from at least one additional donor, with [victim A] being the major contributor.  Eric A. Fuller cannot be excluded as a possible contributor of the DNA to this mixture profile.

R. 947-49; R. 1753, Draft Biological Sciences Case Report, Oct. 10, 2002, Gettig, R. 4.  In the final report, Gettig concluded:

> The STR DNA mixture profile from the vaginal swabs-sperm fraction . . . is consistent with DNA from [the victim] . . . admixed with DNA from Eric A. Fuller . . ., with [the victim] being the major contributor.

R. 948-49; *see* H. 33; Dkt. No. 48-2, Biological Sciences Report, Oct. 15, 2002, Gettig, R.  Gettig explained that his draft report was changed after technical review by another analyst and supervisory review, because "upon review, we determined that there were enough allele's [sic] there" to include petitioner under the lab's criteria.  R. 948-49.  Therefore, Gettig

9

testified, the written conclusion in the final report was modified "to state that it was a mixture of [victim A] and Eric Fuller, rather than [victim A] and an additional donor where Eric Fuller could not be excluded." *Id.* at 948-49. Gettig further explained that under lab protocols, there were several possibilities used to label DNA samples, including that the samples matched a certain person, or did not match, that there can be mixtures that constitute partial profiles, "where we don't get alleles at all of the loci," and that partial profiles are not complete profiles. *Id.* at 950.

On re-direct examination, Gettig confirmed that nothing in the analysis of the vaginal swabs indicated genetic material from any person other than victim A and petitioner because "there were no other alleles that could be accounted for other than by those two individuals." R. 951-52.

### 2. Direct appeal

On direct appeal, petitioner argued that trial counsel was ineffective for, among other things, failing to "call an expert witness regarding DNA matters" and ineffectively cross-examining Gettig regarding the changes in his conclusions from the draft report to the final report without subpoenaing lab protocols. Exhibit. A, Appellant's Brief at 42, 47-51. The Appellate Division rejected all of petitioner's ineffective assistance arguments:

> The majority of defendant's claims of ineffectiveness represent hindsight disagreement with the trial strategies and tactics employed by counsel which, upon this record, do not equate to true ineffective assistance (*see People v Baldi*, 54 NY2d 137, 146 [1981]; *People v Demetsenare*, 14 AD3d 792, 793 [2005]). Faced with substantial testimonial and physical evidence against defendant, counsel placed a cogent theory before the jury, thoroughly cross-examined the People's witnesses, attempted to challenge the forensic evidence and credibility of Gettig's expert DNA report, called numerous rebuttal witnesses, voiced proper objections and made appropriate pretrial and posttrial motions. While this seasoned attorney's performance may have been imperfect, we reiterate that meaningful representation does not mean

representation free of error in every respect (*see People v Ross*, 43 AD3d 567, 570 [2007], *lv denied* 9 NY3d 964 [2007]; *People v Damphier*, 13 AD3d 663, 664 [2004]) and, considering counsel's strategies and alleged errors either alone or in the aggregate, we find them to be insufficient to constitute a deprivation of meaningful representation (*see People v Benevento*, 91 NY2d 708, 712 [1998]).

*Fuller*, 50 A.D.3d at 1176-77.

### 3.    Section 440 motion

In his section 440 motion, petitioner argued that new expert DNA evidence was discovered that could not have been produced by petitioner with due diligence at trial. Specifically, he argued that the testimony of Stephen F. Swinton, Jr., would establish that the DNA profile from the vaginal swab sperm fraction was only a partial STR DNA mixture profile; that there was insufficient DNA evidence to identify petitioner as the source of the male DNA in the vaginal swab mixture because only six of the thirteen STR loci contained alleles that could have come from petitioner, and if petitioner was the contributor of the male DNA, his alleles would "be expected to be seen at four additional STR loci;" and victim A's DNA would have masked petitioner's DNA at three STR loci.  Dkt. No. 48-3; Section 440 Motion; 48-2, Affidavit in Support, Swinton, S., at 1-4.  Petitioner argued this new evidence contradicted Gettig's testimony, and supported petitioner's claim that he did not have sexual intercourse with the victim, especially since there was no "witness testimony of intercourse," and characterized the case as a "credibility contest."  Section 440 motion at 7-8, 16.

Petitioner further argued that this new evidence supported his claim that trial counsel was ineffective for failing to consult with or call an expert at trial, and for not properly cross-examining Gettig.  Section 440 Motion at 11.  Specifically, petitioner claimed that although the differences between the conclusions in Gettig's draft and final report were pointed out to

11

counsel prior to trial, counsel did not "know why it was relevant or what it meant," and had counsel consulted an expert like Swinton, that consultation would have resulted in a more effective cross-examination. *Id.* at 14. Petitioner further argued that although he asked counsel to consult with an expert, counsel did not do so, and also failed to have the DNA evidence examined by an independent laboratory. *Id.* at 15.

On September 29, 2011, a hearing was held on petitioner's motion, and Gettig, Swinton and petitioner testified.[5] In a Decision and Order issued on June 8, 2012, the court denied petitioner's motion. Dkt. No. 48-4; Motion Decision. The court first explained the basic components of DNA evidence, and then summarized Gettig's trial testimony on both direct and cross-examination. *Id.* at 2-10. The court highlighted that trial counsel "was able to get Gettig to admit that he could not say there was a 'match' between the [petitioner's] DNA and the male DNA components in the mixture profile from the vaginal swabs." *Id.* at 8. Trial counsel's questioning also clarified that no "proportional ratio or probability analyses were done as to the male DNA in the vaginal swabs mixture profile being that of" petitioner, and that the statistical probability generated with respect to the pajama bottoms did not apply to the vaginal swabs. *Id.* Counsel also cross-examined Gettig on the differences between his draft and final reports, and "questioned Gettig extensively regarding the laboratory protocols for determining whether to conclude that a particular DNA profile was a 'match' or was 'consistent.'" *Id.* (citing Trial TR. 732-33) (R. 948-49). Counsel elicited from Gettig that it was up to each analyst to review the data and "'from the experience that they have in looking at these profiles, to determine . . . what is the most conservative way of approaching this, of

---

[5] Petitioner's trial attorney, Essex County Public Defender Livingston Hatch, died on January 4, 2010. *See* R. Mem. at 30 n. 12; Dkt. No. 48-6, P. Mem. at 2 n. 4.

reporting it.'" *Id.* at 9 (quoting Trial Tr. 735) (R. 951). Finally, the court noted that on redirect examination, Gettig conceded that his draft conclusion was "much more conservative than what [the lab] finally ended up with." *Id.* at 10 (quoting Trial TR. 735) (R. 951).

The court then explained that petitioner's section 440 motion was based upon new, expert opinion evidence by Swinton. Petitioner claimed Swinton's testimony would establish that Gettig's "report of the DNA analysis performed on the vaginal swab specimens and his trial testimony thereon were 'incomplete' and 'misleading'" because the vaginal swab sperm fraction was only a "'partial STR DNA mixture profile," there was insufficient DNA evidence to identity petitioner as the source of the male DNA because only nine of the thirteen loci contained alleles that could have come from petitioner; and the victim's DNA would have "masked" petitioner's DNA at three STR loci. Motion Decision at 10-11. The court also noted petitioner claimed counsel was ineffective because he failed to retain a DNA expert and present the alleged new evidence at trial, especially since the only corroborating evidence of "the element of penetration for the rape conviction was the presence of the [petitioner's] DNA from the vaginal swabs sperm fraction." *Id.* at 11.

The court emphasized that during Swinton's motion testimony, Swinton opined that Gettig's final report was "incomplete because it doesn't designate whether it's a partial or full STR DNA profile;" that if the sperm fraction profile was "a full DNA profile of all the contributors, Fuller is excluded . . . because there are alleles from Fuller that don't appear in that profile;" and that he found nothing in Gettig's analysis and results to indicate Gettig did not follow laboratory protocols. Motion Decision at 12 (quoting H. 35, 38, 51). The court also noted that Swinton "would have agreed with the now contested conclusion in Gettig's final report if it had been worded to state that 'it was a *partial* STR DNA mixture profile.'" *Id.*

13

(quoting H. 35-36, 51).

The court then concluded that based upon the exhibits presented in support of petitioner's motion, including Gettig's draft and final reports and the STR DNA profile charts, "it is clear that there was not a full STR DNA profile of the vaginal swabs sperm fraction." Motion Decision at 13. The court also noted that the "cross-examination of Gettig" by trial counsel revealed that the STR DNA profile from the vaginal swabs sperm fraction contained alleles consistent with petitioner's DNA at "only six of the thirteen loci, with three other loci having alleles that could have been from either" victim A or petitioner. *Id.* But the court pointed out that there was no evidence presented at trial that the sperm fraction STR DNA was a full profile - a fact Swinton acknowledged at the hearing. *Id.* at 13-14. Therefore, the court found, Swinton's hearing testimony that unless the jury was told the profile was partial, "'that causes prejudice because it necessarily . . . implies that it's a complete DNA profile, which it cannot be if [petitioner] is a contributor,'" was "speculative." *Id.* at 13-14 (quoting H. 41).

The court further found it significant that Swinton "admitted that there were no alleles present at all thirteen genetic marker locations that could not be attributed to either the victim or [petitioner], a fact 'consistent with being a partial mixture profile of at least two people' who could be the victim and [petitioner]." Motion Decision at 14 (quoting H. 56). Swinton also agreed that if the profile was partial, petitioner could not be 'excluded as the donor of that DNA.'" *Id.* (quoting H. 75). Finally, the court found it significant that Swinton "admitted that the alleles at nine out of the thirteen genetic markers from the vaginal swab sperm fraction were consistent with those of the [petitioner's] DNA profile such that 'he would be included as

14

a potential contributor.'" *Id.* (quoting H. 78).  Based upon Swinton's hearing testimony, the trial court concluded that petitioner's "challenge to Gettig's report and testimony is more semantic than substantive; a distinction without any probative difference or value." *Id.*

The court then found Swinton's claim that a DNA expert retained by counsel at trial could have "calculated the statistical 'likelihood that you would see this particular piece of evidence, this mixed DNA profile if the contributors were [victim A] and [petitioner] versus the likelihood that you would see it if it was [victim A] and someone else'" to be "conjectural." Motion Decision at 14-15 (quoting H. 43).  Swinton did not perform a statistical analysis, and he "testified that if it was established that the [petitioner] was the only male with access to the victim during the time period in question, the issues now raised about the DNA evidence at trial 'to some extent . . . doesn't matter.'" *Id.* at 15 (quoting H. 81).

Based on the foregoing findings, the court concluded that petitioner failed to prove by a preponderance of the evidence that Swinton's opinion would "probably change the result if a new trial is granted." Motion Decision at 15.  The court further concluded that petitioner failed to show that the expert evidence "was discovered only after the trial occurred and that it could not have been earlier discovered with due diligence." *Id.*

With respect to petitioner's ineffectiveness claims, the court concluded that petitioner failed to establish that trial counsel was ineffective for failing to consult with or call an expert under either federal or state standards.  Motion Decision at 15-18.  The court pointed out that the evidence at trial established petitioner was

> the only male who had access to the victim, it was uncontroverted that his
> semen was on the victim's pajama bottoms, and the DNA analysis of the
> vaginal swabs sperm fraction showed that all of the alleles present at the
> thirteen genetic marker locations could be attributed to either the victim or the
> [petitioner] *and* the alleles at nine out of the thirteen genetic markers were
> consistent with those of the [petitioner's] DNA profile.

Motion Decision at 19 (emphasis in original).  That evidence, combined with Swinton's

opinion that any questions about Gettig's trial testimony that the STR DNA mixture profile

was consistent with petitioner's profile "'to some extent' did not matter because of the trial

evidence that the [petitioner] was the only male with access to the victim," meant that

petitioner failed to show a "substantial" likelihood that the result at trial would have been

different had Swinton's testimony been produced at trial.  *Id.*  (quoting H. 81).

Finally, the trial court concluded that "the adequacy of trial counsel's performance

relative to the DNA evidence and his failure to retain an expert to testify at trial was already

addressed in the 2007 appeal," and that all of his claims were rejected by the Appellate

Division.  Motion Decision at 19-21.

### 4.    Analysis

As the Appellate Division found, a review of the record indicates that petitioner's trial

counsel adequately represented him in all respects.  Counsel filed pretrial motions, including

motions to dismiss the indictment and for discovery, and a motion for the trial judge's recusal.

R. 95-97, 141-48, 199-203.  He vigorously cross-examined witnesses, pointing out

inconsistencies in the proof and eliciting testimony favorable to petitioner, and challenged

forensic evidence.  R. 458-75, 578-622, 625, 682-713, 717-32, 801-17, 869-71, 895-907,

941-50, 952, 1018-1035.  Counsel also presented eleven witnesses, including petitioner, in

an effort to undermine the prosecutor's evidence.  R. 1102-1340.

At the close of the People's case, counsel moved for a trial order of dismissal, and renewed his motion at the close of the defense case. R. 1069-70, 1343-57. With respect to the first degree rape charge, counsel argued that since the male DNA recovered from the vaginal swab was "consistent" with, but not a match to, petitioner's DNA, that evidence only meant that "a male [was] present in [victim A's] vaginal area and there is no corroboration . . . to show that there was any penetration [by petitioner]." R. 1069-70. Counsel actively participated in the jury charge conference. R. 1359-1411, 1424-29. He delivered a summation in which he argued that the evidence was insufficient to show that victim A was physically helpless, pointing out that the told a nurse she did not pass out, she walked up and down the basement stairs a number of times, and she obtained the password to petitioner's daughter's computer and logged on. R. 1435-42. He argued victim A testified she had "absolutely no idea" whether petitioner penetrated her. R. 1442. Counsel challenged the importance of the DNA evidence, arguing that Gettig could only say the vaginal swab sperm fraction was "consistent" with petitioner, not that it matched him, and that neither Gettig nor the prosecutor explained what "consistent" meant. R. 1445-47. He argued that Gettig's draft report was important because the conclusion was that petitioner could not be excluded, that the meaning of that conclusion was unclear, and asked, "Was there another male?" R. 1446. Counsel then attacked the proof presented in support of the other counts of the indictment. R. 1448-51.

That counsel's efforts were unsuccessful does not render him ineffective. *Pratt v. Upstate Corr. Fac.*, 413 F. Supp. 2d 228, 244 (W.D.N.Y. 2006) (stating that counsel is not ineffective simply because the chosen strategy failed). As the Appellate Division noted, "[w]hile this seasoned attorney's performance may have been imperfect," petitioner is not

entitled to "representation free of error in every respect [.]" *Fuller*, 50 A.D.3d at 1176-77; *see Richter*, 131 S. Ct. at 791 ("*Strickland* does not guarantee perfect representation, only a reasonably competent attorney") (quoting *Strickland*, 466 U.S. at 487) (internal quotation marks omitted).

Nonetheless, petitioner claims that counsel was ineffective because he did not consult with or call an expert at trial. He argues that had counsel done so, he would have encountered an expert like Swinton, who could have testified about the differences between Gettig's draft and final reports, the fact that the DNA profile from the vaginal swab was a partial profile, and that if it was a full profile, petitioner would have been excluded. Petitioner also argues that even if counsel elected not to call an expert, consulting with one could have helped counsel better understand the DNA evidence, leading to a more effective cross-examination of Gettig. Dkt. No. 48-4 at 11, 12-17.

"The decision whether or not to call an expert witness generally falls within the wide sphere of strategic choices for which counsel will not be second-guessed on habeas review." *Savinon v. Mazucca*, No. 1:04-CV-1589, 2005 WL 2548032 at *33 (S.D.N.Y. Oct. 12, 2005) (citation omitted), adopted 2006 WL 2669331 (S.D.N.Y. Sept. 18, 2006)). As the Supreme Court has noted, "cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both," but there are "'countless ways to provide effective assistance in any given case.'" *Richter*, 131 S. Ct. at 789 (quoting *Strickland*, 466 U.S. at 689). "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Richter* at 791. Instead, often "cross-examination will be sufficient to expose defects in an expert's presentation," and when

counsel "does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict." *Id.*

In this case, the record supports the state court's conclusion that petitioner's challenge to Gettig's final report and his trial testimony was "more semantic than substantive; a distinction without any probative difference or value," and that petitioner failed to show that the result at trial would have been different had counsel consulted with or called an expert to testify at trial. Motion Decision at 14, 19.

As the court found, the "DNA analysis of the vaginal swabs sperm fraction showed that all of the alleles present at the thirteen genetic marker locations could be attributed to either the victim or the [petitioner], and the alleles at nine out of thirteen genetic markers were consistent with" petitioner's DNA profile. Motion Decision at 19; H. 64. Swinton testified that he believed Gettig's report was misleading because it did not indicate that the DNA mixture profile from the vaginal swabs was a "partial" DNA profile, but he otherwise agreed with Gettig's conclusion that the DNA was consistent with DNA from victim A and added DNA from petitioner, with victim A being the major contributor. H. 10-12, 31-32, 35-36, 38, 40-42. Swinton also testified that there was nothing to indicate Gettig failed to follow protocol, he agreed Gettig's results were accurate, and that Gettig's final report does not indicate that the DNA profile was a full profile. *Id.* at 51-59. Importantly, as the state court pointed out, Swinton agreed that the alleles present on all thirteen loci could be attributed to either victim A or petitioner, and that the alleles at nine of those loci were consistent with petitioner's DNA profile. *Id.* at 64-65.

Swinton further testified that he reviewed the DNA evidence in a vacuum, and that if the trial evidence was that petitioner was the only male with access to the victim during the

19

relevant time frame, "then to some extent this doesn't matter." H. 81. Swinton also testified that any expert counsel consulted could have given the same opinion as Gettig's, and that consulting an expert might not have made a difference. *Id.* at 84. Finally, Swinton agreed that neither Gettig's draft nor the final report excluded petitioner as the donor of the male DNA on the vaginal swabs. *Id.* at 83-84.

Based on the foregoing, the state court's conclusion that petitioner failed to establish prejudice because he did not show that Swinton's testimony, or that of another similar expert, would have changed the result at trial was not unreasonable, or contrary to *Strickland*. *Strickland*, 466 U.S. at 693-94, 689.

Additionally, as the Appellate Division found, trial counsel was not ineffective in the manner in which he cross-examined Gettig. P. Mem. at 4. The manner in which counsel conducted cross-examination is a tactical decision and will not be second-guessed by a reviewing court unless there is no strategic justification for counsel's chosen course of action. *Richter,* 131 S. Ct. at 790; *see Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) ("Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim.") (citation omitted).

Here, Swinton testified that his main problem with Gettig's report was that the conclusion changed from the draft to the final report. H. 73. But as Swinton acknowledged, trial counsel admitted as an exhibit Gettig's draft report, and questioned Gettig on the differences in the conclusions between the draft and final reports. H. 72-74; R. 931-32, 941-53. Counsel was able to argue in summation that the People and Gettig failed to define what "consistent" meant, pointed out that there was no match to petitioner's DNA on the vaginal

swabs, and implied that could mean another male was the contributor instead of petitioner. R. 1445-47. That counsel chose to bring out during cross-examination any inconsistencies or problems with the state's DNA evidence instead of calling his own expert does not render him ineffective in this case. *Richter*, 131 S. Ct. at 789 ("Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach.") (quoting *Strickland*, 466 U.S. at 689).

Petitioner's reliance on *Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005), *Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003), *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001) and *Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001) for the broad proposition that "the failure to consult with or produce the testimony of an expert as to the significance of physical evidence presented by the prosecution amounts to deficient performance" is misplaced. Dkt. P. Mem. at 9. In *Gersten*, 426 F.3d at 608, the Second Circuit explicitly stated that "[w]e do not . . . mean to hold that expert consultation is always necessary in order to provide effective assistance of counsel in child sexual abuse cases [.]" Moreover, *Gersten*, *Eze*, *Pavel* and *Lindstadt* each involved circumstances not present in this case.

For example, in *Gersten*, the "prosecution's case rested centrally on the alleged victim's testimony and its corroboration by the indirect physical evidence as interpreted by [a] medical expert." *Gersten*, 426 F.3d at 608. The only direct evidence that any crime occurred, and that the defendant committed it, was the victim's testimony. *Id.* at 608. The Second Circuit noted that in sexual abuse cases, the "failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel . . . " where "the prosecution's case, beyond the purported medical evidence of abuse, rests on the credibility of the alleged victim, as opposed to direct physical evidence such as DNA, or third party eyewitness

testimony." *Gersten*, 426 F.3d at 607.

The Second Circuit found that trial counsel lacked a legitimate strategic basis for his decision not to conduct an investigation in order to challenge the medical evidence against Gersten, and concluded that had counsel investigated, discovered and called medical expert witnesses on child sexual abuse to challenge the state's "questionable medical expert testimony," there was a "reasonable probability that the trier of fact would have rejected the entirety of the alleged victim's narrative as not credible, because her assertion that [the defendant] penetrated her almost daily over a period of years would be inconsistent with the lack of any medical evidence of penetration." *Gersten*, 426 F.3d at 608-12.  Counsel was also deficient for failing to challenge the state's psychological evidence regarding child sexual abuse accommodation syndrome, which was offered to "bolster the alleged victim's credibility, primarily by explaining her failure to reveal the abuse earlier and her inability to provide a consistent and detailed account of the abuse." *Id.* at 611.  Had counsel "investigated the possibility of challenging the prosecution's psychological expert, he would have discovered that exceptionally qualified experts could be found who would challenge the scientific validity of the prosecution expert's other theories about, for example, adolescence prompting disclosure of sexual abuse." *Id.* at 611.

Similarly, Eze was convicted almost entirely based on the testimony of two child victims, with expert testimony "substantiating their credibility and medical evidence suggesting that the girls may have been victims of sexual abuse." *Eze*, 321 F.3d at 112. Counsel failed to challenge the basis for the state's medical evidence that a physical examination of the victim's hymens showed symptoms consistent with abuse; question the prosecutor's medical expert about a previous examination that showed the hymen

abnormalities may have existed prior to the alleged abuse; or call a defense expert.  *Id.* at

115-16, 126-30.  Counsel also ineffectively challenged psychological evidence offered to

explain "traits commonly manifested in victims of child sexual abuse to aid the jury in

assessing the credibility of the children's testimony" and to understand why their stories

changed over time.  *Eze*, 321 F.3d at 127-29, 132-33.  Those and other errors resulted in the

case being remanded for an evidentiary hearing at which counsel could explain the strategic

basis for the identified errors.  *Id.* at 138.

Lindstadt was convicted of the rape of his minor daughter "on the basis of testimony

from his daughter and estranged wife, and on testimony from two experts."  *Lindstadt*, 239

F.3d at 193.  Lindstadt denied the abuse and claimed the allegations were "fabricated by his

embittered wife."  *Id.* at 194.  The Second Circuit found that Lindstadt's counsel was

ineffective based on the cumulative effect of four errors: failing to notice a "one-year error in

the date of the alleged abuse;" failing to make an effective challenge to medical evidence

consisting of "bumps and clefts on the child's hymen" and sub-dermal scarring, and

investigate or request copies of the so called "Boston study" upon which the medical

conclusions were based; telling the jury in his opening statement that Lindstadt would only

testify if the prosecutors proved their case, and then calling Lindstadt to testify; and failing to

make "an obvious relevance argument" to the trial court in support of the proffered testimony

of two law enforcement witnesses who would have bolstered the defense.  *Lindstadt*, 239

F.3d at 194, 198-204.  Because the case was one of "underwhelming evidence," these errors

resulted in prejudice.  *Id.* at 204-206.

Finally, *Pavel* was convicted of sexually abusing his two minor sons.  *Pavel*, 261 F.3d

at 211.  Counsel believed that "that there was little if any physical evidence that Pavel had

sexually abused the boys in the manner that they alleged" and, therefore, counsel "did not prepare a defense; instead, he planned to move to dismiss the charges against Pavel at the close of the prosecution's presentation of its evidence, and was confident that the trial judge would grant the motion." *Pavel*, 261 F.3d at 211-12. When the motion was denied, counsel "put Pavel on the stand, and then rested without calling any other witnesses." *Id.* at 212.

The Second Circuit found that counsel was ineffective for failing to call a psychiatrist and court-appointed mediator who conducted numerous counseling sessions between Pavel and his wife to resolve a custody dispute, who would have "buttressed [counsel's] argument that Ms. Pavel fabricated her trial testimony by implying that she was hostile to the accused." *Id.* at 222. Additionally, there was "an obvious, commonsense mismatch" between the medical findings of the boys (showing nothing abnormal about one boy, and mild "redness" in the other boy's anal area) and the boys' claims that Pavel "anally sodomized" them "once a week for four months, and that he did so with even greater frequency in the days leading up to the examination of the boys." *Id.* at 224. The Second Circuit found that had counsel "conducted an adequate pre-trial investigation of the physical evidence" and "sought a medical expert who might have testified on behalf of the defense," he would have

> come across and called to the stand a physician such as Dr. Margaret McHugh-a physician with extensive experience in, *inter alia*, evaluating and/or treating victims of child abuse. In an affidavit submitted in the state-court post-conviction proceedings, Dr. McHugh stated unequivocally that the boys' medical condition was simply not "consistent"-as Dr. Madden had testified-with their having been repeatedly anally sodomized with the frequency that they described[.]"

*Id.* at 227-28. The court also found that the "hesitation to disturb strategic decisions" of trial counsel did not apply *Pavel* because counsel had no strategy to speak of other than his hope that the case would be dismissed. *Id.* at 219.

Petitioner also relies on *Bell v. Miller*, 500 F.3d 149 (2d Cir. 2007) in support of his claim that counsel in this case should have consulted an expert. *Bell* involved a shooting victim who suffered such trauma as a result of the attack that his "memory was highly vulnerable to attack by scientific evidence." *Bell*, 500 F.3d at 155. The victim was the only witness who linked Bell to the crime. *Id.* at 155-56. Counsel's failure to call a medical expert to testify to "the effects of trauma, blood loss, and anxiolytic and amnestic medications on the human brain," and thus on the victim's ability to identify his attacker, rendered counsel ineffective. *Id.* at 156-57.

In contrast, this case is not one where unchallenged medical evidence or psychological evidence was presented to bolster victim A's version of events. This is also not, as petitioner insists, a "credibility contest" between victim A and petitioner, where "the only witnesses to the alleged abuse were its victims and the defendant, and there was no substantial circumstantial evidence of abuse." *Pavel*, 261 F.3d at 224 (citing *Lindstadt*). Indeed, petitioner admitted that he engaged in inappropriate sexual behavior with victim A, but denied penetration, and, as counsel pointed out in his summation, victim A could not state with certainty that she was penetrated. R. 1442. It is, however, uncontroverted that petitioner's semen was found on victim A's pajamas, and that his DNA was consistent with the male DNA found on the vaginal swabs taken from victim A. At the section 440 motion hearing, petitioner's own expert agreed that petitioner could not be excluded as the contributor of the male DNA found on the vaginal swab, that "all of the alleles present at the thirteen genetic markers could be attributed to either the victim" or petitioner, and that "the alleles at nine out of the thirteen genetic markers were consistent" with those of petitioner. Motion Decision at 19; H. 76-82.

Based upon the evidence presented in this case, *Gersten*, *Eze*, *Pavel, Lindstadt* and *Bell* do not change this court's determination that the state court's decision was not contrary to, or an unreasonable application of, clearly established supreme court precedent. *See Richter*, 131 S. Ct. at 789 ("It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, but even that formulation is sufficiently general that state courts would have wide latitude in applying it.").

To the extent that petitioner claims counsel failed to obtain copies of the lab's protocols, that claim also does not warrant habeas relief. P. Mem. at 13-14. As previously noted, petitioner's own expert testified at the section 440 motion hearing that he agreed Gettig's results were accurate, and that there was nothing in his review of Gettig's reports to suggest that Gettig failed to follow lab protocols. H. 51-54. Under these circumstances, counsel's failure to obtain the lab protocols did not result in prejudice to petitioner.

Finally, the record supports the state court's rejection of petitioner's claim that an expert could have "calculated the statistical 'likelihood that you would see . . . this mixed DNA profile if the contributors were [the victim] and Fuller versus the likelihood that you would see it if it was [victim A] and someone else." Motion Decision at 14-15. Swinton did not provide that statistical analysis, and petitioner failed to offer one during the section 440 hearing. *Id.* at 15. But, as the court concluded, Swinton agreed with Gettig that "there were no alleles present at all thirteen genetic marker locations that could not be attributed to either the victim or [petitioner]," and that petitioner could not be "'excluded as the donor of that DNA.'" *Id.* (citing H. 75). Swinton also acknowledged that if the evidence showed-as it did in this case-that petitioner "was the only male with access to the victim during the time period in question, the issues now raised about the DNA evidence at trial 'to some extent . . . doesn't matter.'"

*Id.* Petitioner's complaint that, based upon Gettig's report, the jury was left with a false impression that the DNA mixture profile contained DNA from the victim and petitioner, and no one else, fails for the same reason.[6]

In sum, the state courts' rejection of petitioner's ineffectiveness claims was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See Richter*, 131 S. Ct. at 790 ("To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates. All that happened here is that counsel pursued a course that conformed to the first option. . . . In light of the record here there was no basis to rule that the state court's determination was unreasonable [.]"); *Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."); *Jenkins v. Unger*, No. 9:03-CV-1172, 2007 WL 911889 at *6 (N.D.N.Y. Mar. 22, 2007) (discussing reluctance to second-guess counsel's trial strategy simply because that strategy was unsuccessful). Ground One of the amended petition is denied and dismissed.

---

[6] To the extent petitioner claims that had counsel consulted with an expert, he would have known to object to the prosecutor's comment in summation that the DNA mixture profile consisted of "[victim A], Eric Fuller and nobody else," a comment he characterizes as "critically prejudicial," that argument also fails. *See* P. Mem. at 16 (citing R. 1471). Petitioner failed to show that the prosecutor's remark "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). The prosecutor's comment, in context, was in fair response to defense counsel's summation. *See* R. 1445-46; 1471-72; *Darden*, 477 U.S. at 181-182 (prosecutor's summation did not render trial fundamentally unfair where prosecutor did not manipulate or misstate the evidence, and comments were in part invited by or responsive to the summation of the defense). Finally, the trial court instructed the jury, both before summations and in its final charge, that the comments of the attorneys were not evidence. R. 1431-32, 1482. The jury is presumed to have understood and followed those instructions. *Zafiro v. United States*, 506 U.S. 534, 540 (1993). Counsel was not ineffective for not objecting to this comment, and the state court's rejection of this argument was not, therefore, contrary to or an unreasonable application of *Strickland*.

### C.     The trial judge's recusal decision

In Ground Two of his petition, petitioner argues that the trial court judge should have recused himself because the judge also presided over petitioner's family court matters, including divorce and child custody proceedings.  Petitioner states that he appeared before the judge "more than twenty times" during those family court proceedings, and petitioner's ex-wife "falsely accused [petitioner] of committing child abuse, being a drunkard and raping her" during the custody proceedings.  P. Mem. at 18.  Petitioner claims that the allegations made against him during the family court proceedings "affected the trial judge's impartiality and fairness." *Id.*  In support of that allegation, petitioner claims that during a family court appearance weeks prior to the criminal trial, the judge told him that the family court proceedings did not matter because of "all the time [petitioner] was facing in prison," and that petitioner's family court attorney told petitioner the judge made "derogatory remarks and improper comments about [petitioner] while they were playing golf together." *Id.*  Petitioner also claims that during the family court proceedings, petitioner told the judge he "ran his courtroom like a circus," and although the judge threatened to have him arrested if he left the courtroom, petitioner left anyway.  *Id.* at 18-19.  Petitioner's argument appears to be that because he criticized the judge during family court proceedings, the judge is presumptively biased against him.  *Id.* at 19.

Petitioner's motion for recusal was denied during a pretrial conference held on January 28, 2003.  The judge first found that the papers did not set forth sufficient facts to warrant recusal.  Record on Appeal, Volume V, Ex. I; Transcript, Jan. 28, 2003, at 2.  The judge remembered a custody matter involving petitioner, and acknowledged that "all the bad things come out in custody trials from both sides." *Id.* at 3.  The judge stated, however, that

he did not "remember any child abuse or sexual abuse matters" in relation to petitioner's custody trial that ended early when petitioner's ex-wife "ended up in the Detox Unit or something up in Plattsburgh [.]" *Id.* at 3-4. The judge also stated that he did not go back and review the family court file based upon petitioner's recusal motion. *Id.* at 4. The judge stated that he had "no feelings for or against" petitioner, and that petitioner was indicted but "presumed innocent until proven guilty," a concept that the judge stated he believed in "firmly [.]" *Id.* He also explained that before issuing a securing order against petitioner, he reviewed his criminal record, but that he was required to do so by statute. *Id.* at 4-5. Finally, the judge reiterated that there was "absolutely no prejudice, bias, bad feelings in [his] mind" toward petitioner. *Id.* at 5.

Petitioner raised his recusal claim on direct appeal, and the Appellate Division rejected it, finding that "County Court did not abuse its discretion by declining recusal." *Fuller*, 50 A.D.3d at 1177 (citations omitted). That determination was not contrary to or an unreasonable application of clearly established Supreme Court precedent.

It is well-settled that a defendant's right to a fair trial includes a right to a trial "before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 905 (1997) (citations omitted). A state court judge is required to recuse himself only if he has demonstrated "deep seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *McMahon v. Hodges*, 382 F.3d 284, 287, 290-91 (2d Cir. 2004) (holding that judge's statement that defendant would likely be convicted given evidence at co-defendant's trial did not require recusal). Under New York law, absent a legal requirement

that he or she recuse,[7] a County Court Judge is deemed to be " 'the sole arbiter' of whether any bias or appearance of bias requires recusal." *Hernandez v. Senkowski*, No. 1:98-CV-5270, 1999 WL 1495443 at *29 (E.D.N.Y. Dec. 29, 1999) (citing *People v. Moreno*, 70 N.Y.2d 403, 405 (1987)).  Even when recusal may be the "better practice ... to maintain the appearance of impartiality," the judge is still the "sole arbiter" of the decision.  *Moreno*, 70 N.Y.2d at 406.

Here, petitioner alleges that the trial judge harbored hostility toward him based on the prior family court custody matter, but the trial judge specifically addressed that claim, assuring petitioner and his counsel that he had no biased feelings for or against petitioner. Petitioner has failed to provide evidence in support of his claim that the trial judge was biased against him, or that the judge was otherwise required to recuse himself, and points to nothing that occurred during the trial that might support his arguments.  *Liteky*, 510 U.S. at 555.

Petitioner's reliance on *Taylor v. Hayes*, 418 U.S. 488, 501 (1974) in support of his claim that because petitioner criticized the trial judge in an unrelated family court proceeding and left the courtroom, there is a "presumption of bias" on the part of the judge, is misplaced. *Taylor* involved a criminal case in which a defendant's attorney was held in contempt of court based upon his behavior during the trial.  *Taylor*, 418 U.S. at 489-91.  The Supreme Court ruled that the attorney did not receive due process, and set aside the contempt judgment.  *Id.* at 497-500.  The Supreme Court further found that if the attorney was to be tried again for contempt, he should not be tried by the same judge who imposed the original contempt judgment, because that judge became "embroiled in a running controversy" with the attorney,

---

[7]  The statutory grounds for recusal of County Court Judges are found in section 14 of the New York Judiciary Law.  NY Jud. § 14.

and "there was a mounting display of an unfavorable personal attitude toward [the attorney], his ability, and his motives, sufficiently so that the contempt issue should have been finally adjudicated by another judge." *Id*. at 501-502. Nothing of the sort took place in this case.

Based on the foregoing, this court cannot conclude that the Appellate Division's rejection of petitioner's recusal claim was contrary to or an unreasonable application of clearly established Supreme Court precedent. Ground Two of the amended petition is denied and dismissed.

IV.   **CONCLUSION**

**WHEREFORE**, it is

**ORDERED** that the amended petition for a writ of habeas corpus, Dkt. No. 48, is **DENIED** in its entirety and **DISMISSED**; and it is further

**ORDERED** that no certificate of appealability shall issue in this case because Petitioner has failed to make a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2);[8] and it is further

**ORDERED** that the Clerk serve a copy of this Decision and Order upon the parties in accordance with the Local Rules.

 **IT IS SO ORDERED.**

Dated: March 8, 2013

Binghamton, NY

---

[8]  *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) ("§ 2253 permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right'").

Thomas J. McAvoy
Senior, U.S. District Judge